IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SAMANTHA CATIR,                          *

    v.                                   *        CIVIL No. SKG-09-2325

MICHAEL ASTRUE,                          *
COMMISSIONER OF SOCIAL SECURITY

                                         *

## MEMORANDUM OPINION

Plaintiff, Samantha Catir, by her attorney, Paul R. Schlitz, Jr. Esq., filed this action seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA"), pursuant to 42 U.S.C. § 405(g), who denied Ms. Catir's claim for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II of the Social Security Act ("the Act"), as amended, 42 U.S.C. §§ 401–434.

This case has been referred to the undersigned magistrate judge by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301. (ECF No. 8). Currently pending before the Court are cross motions for summary judgment. (ECF Nos. 14 and 26). No hearing is necessary in this case. Local Rule 105.6. For the reasons discussed below, this Court DENIES Ms. Catir's motion for summary judgment and GRANTS the Commissioner's motion.

## I. Procedural History

1

Plaintiff, Ms. Samantha Catir, filed for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Both Ms. Catir (ECF 14-1, 2) and the Administrative Law Judge's ("ALJ") opinion (R. 14) cite July 13, 2005 as her filing date for SSI and DIB. The Commissioner cites her filing date as August 26, 2005. (ECF 26-1, 1); See (R. 51). This conflict of filing dates is immaterial to the questions presented.

Ms. Catir's applications were denied at both the initial and the reconsideration levels. (R. 41, 44). A hearing was held on June 3, 2009 before ALJ Timothy C. Pace. (R. 316-352). On July 16, 2008, ALJ Pace denied Ms. Catir's claim for benefits on the grounds that she had the capacity to successfully adjust to other work that existed in significant numbers in the national economy. (R. 25-26). The Appeals Council subsequently denied Ms. Catir's application for review, making the ALJ's decision the final decision of the SSA. (R. 6-8). Ms. Catir has exhausted her administrative remedies and seeks review of the SSA decision by this Court. (ECF No. 14).

## II. Factual Background

The Court adopts the Commissioner's Statement of Facts, having reviewed the record and finding them to be accurate and complete.

### III. ALJ Findings

In evaluating Ms. Catir's claim for disability under the Act, the ALJ must consider the entire record and follow the sequential five step evaluation process set forth in 20 C.F.R. § 404.1520(a). Upon completion of the five step evaluation process in this case, the ALJ concluded that Ms. Catir was not disabled under the Act because she could adjust to other jobs available in significant numbers in the national economy. (R. 25-26).

At step one, the claimant must prove that she is not engaged in any "substantial gainful activity."[1] 20 C.F.R. § 404.1520(a)(4)(i). If the ALJ finds that the claimant has engaged in "substantial gainful activity," then the claimant will not be considered disabled. Ms. Catir previously worked as a fast food worker, sorter, order filler and bell ringer. (R. 343). The ALJ determined that none of these activities reached the level of substantial gainful activity. (Id.). Because she has never engaged in substantial gainful activity, Ms. Catir satisfied this first step. (R. 16).

---

[1] Substantial gainful activity is defined as "work activity that is both substantial and gainful." 20 C.F.R. § 416.972. Work activity is substantial if it involves doing significant physical or mental activities and even if it is part time or if plaintiff is doing less, being paid less, or has fewer responsibilities than when he worked before. 20 C.F.R. § 416.972(a). Substantial gainful activity does not include activities such as household tasks, taking care of oneself, social programs, or therapy. 20 C.F.R. § 416.972(c).

At the second step, the ALJ must determine whether the claimant has a severe, medically determinable impairment or a combination of impairments that limit her ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), 404.1520(c), 416.920(c); see also 20 C.F.R. §§ 404.1521, 416.921. There is also a durational requirement that plaintiff's impairment last or be expected to last for at least 12 months. 20 C.F.R. § 416.909.

Here, the ALJ found that Ms. Catir's juvenile rheumatoid arthritis, bipolar disorder and personality disorder were severe impairments. (R. 16). However, the ALJ did not find any of her other conditions to be severe impairments. He rejected Dr. Miller's assessment of reading, cognitive and impulse control disorders and further found that Dr. Miller's assessment of illiteracy was inconsistent with Ms. Catir's medical history. (R. 18). The ALJ similarly rejected Dr. Miller's diagnosis of cognitive disorders because Dr. Gallagher, Ms. Catir's treating physician, assessed Ms. Catir with average intellectual functioning and because Dr. Miller did not perform a formal intelligence assessment. (Id.). The ALJ also rejected Dr. Miller's assessment of an impulse control disorder, as it was based on testimony provided by Ms. Catir's grandmother regarding a single occasion on which Ms. Catir had cut up her grandmother's sweaters. (Id.).

4

At step three, the ALJ considers whether the claimant's impairments, either individually or in combination, meet or equal an impairment enumerated in the "Listing of Impairments" in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing" or "LOI"). 20 C.F.R. § 416.920(a)(4)(iii). The ALJ found that Ms. Catir's impairments did not equal in severity any pertinent section of the listings, whether considered singly or in combination. (R. 18-20).

The ALJ determined that Ms. Catir's rheumatoid arthritis did not approach the severity of the condition described in section 14.09A as her consultative examinations from Dr. Yu in April 2006 (R. 252-255) and Dr. Waseem in November 2006 (R. 268-271) showed no signs of arthritis. (R. 18).

The ALJ determined that Ms. Catir's bipolar disorder and personality disorder met the "A" criteria for section 12.04 and 12.08; however, these conditions when considered singly or in combination did not meet the "B" criteria. (R. 18). To satisfy the part "B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. 20 CFR Pt. 404, Subpt. P, App. 1. A marked limitation means more than moderate but less than

extreme. Id. Repeated episodes of decompensation, means three episodes within one year, lasting at least two weeks. Id.

The ALJ determined that Ms. Catir had only moderate restrictions of daily living. (R. 19). When Ms. Catir was depressed, she would stay in bed and watch television. (Id.). On days when Ms. Catir was experiencing a manic episode, she would throw out her dirty clothes instead of putting them in the laundry. (Id.). However, she was found to only have moderate restrictions because Dr. Taller found that most of Ms. Catir's activities were on her own initiative, not as a result of prompting (R. 224), and because Ms. Catir's activities included regularly visiting the library, attending church, shopping for groceries, preparing simple meals and washing dishes. (R. 19).

With regard to Ms. Catir's social functioning, the ALJ determined that she had moderate difficulties. (Id.). Ms. Catir was easily irritated; she did not relate well with supervisors and co-workers and had been fired from several jobs due to her temper. (Id.). However, contrasted with her testimony, Ms. Catir's written statements asserted that she got along adequately with authority figures and had never been fired because of an inability to get along with others. (Id.). In evaluating the conflicting evidence, the ALJ concluded that Ms. Catir only had moderate restrictions in social functioning. (Id.).

The ALJ determined that Ms. Catir also had moderate difficulties with regard to her concentration, persistence or pace. (Id.). Ms. Catir advised that she is unable to manage her finances and has difficulty understanding, concentrating, remembering and completing tasks. (Id.). However, Dr. Taller assessed Ms. Catir as having average concentration and memory, and determined that she was able to understand, remember, and follow simple job instructions independently. (R. 226). In evaluating the conflicting evidence, the ALJ made a finding of moderate restrictions on concentration, persistence and pace. (R. 19). Finally, the ALJ determined that Ms. Catir had only one to two episodes of decompensation. (Id.). Because Ms. Catir's mental impairments did not cause at least two "marked" limitations, the paragraph "B" criteria for section 12.04 or 12.08 were not satisfied.

Before an ALJ advances to the fourth step, he must assess the claimant's "residual functional capacity" ("RFC"), which is then used at the fourth and fifth steps. 20 C.F.R. § 404.1520(e). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The ALJ must consider even those impairments that are not "severe." 20 C.F.R. § 404.1545(a)-(e).

The ALJ determined that Ms. Catir's residual functional capacity allowed her to perform light work that was limited to simple, unskilled tasks. (R. 20). These tasks would not require any ability to understand or remember, and it would only require her to carry out simple instructions that did not require her to interact with others. (Id.). In reaching his conclusion, the ALJ determined that Ms. Catir was not credible due to significant inconsistencies in her statements. (R. 21). Her inconsistencies included describing herself as functionally illiterate when her hobbies included reading almost daily and using the computer; stating that she was easily distracted and could not get things done, yet she was able to read two chapters in a social studies book and five chapters of Harry Potter; stating that she rarely reads instructions, yet one of her hobbies is playing board games. (Id.). She further claimed to have never been fired for not getting along with other people, yet she was fired from one job due to an argument she had with a customer and from other jobs because of her temper. (Id.).

The ALJ also determined that Ms. Catir's daily activities included visits to the library and church, going shopping, washing dishes, feeding pets, and preparing simple meals (e.g., cereal, sandwiches). (Id.). She was also able to take care of her personal needs, leave her home independently, make her bed and pick up clothes. (Id.).

The ALJ found only limited evidence in support of any limitations due to arthritis. (R. 22). Both Drs. Yu and Waseem agreed that she had demonstrated no signs of arthritis. (R. 252-255, 268-271). Dr. Murshed's progress notes similarly indicated no current assessment or diagnosis of arthritis. (R. 286-303).

With regard to Ms. Catir's mental limitations, the ALJ found that Ms. Catir had been non-compliant with her medical instructions. (R. 22). She disregarded medical advice to remain hospitalized when she had psychotic symptoms. (Id.). She had skipped her weekly therapy appointments. (Id.). Moreover, her medication had improved her condition, as was confirmed by Dr. Latif (R. 279-285), and she had not been hospitalized since August 2005. (Id.).

The ALJ afforded limited weight to Dr. Gallagher's opinion of Ms. Catir's physical impairments, as he found it inconsistent with Drs. Yu's and Waseem's assessments that Ms. Catir had no symptoms of arthritis. (R. 23). Furthermore, Dr. Gallagher's specialty is in internal medicine while Dr. Yu is certified in physical medicine and rehabilitation. (Id.). Moreover, Drs. Yu and Waseem conducted detailed physical examinations, whereas Dr. Gallagher reported no such examinations. (Id.).

The ALJ also afforded limited weight to Dr. Gallagher's opinion of Ms. Catir's mental impairments, as he found the

Global Assessment of Functioning ("GAF") score that Dr. Gallagher assigned to Ms. Catir to be inconsistent with his narrative description. (Id.). Dr. Gallagher's mental evaluation indicated that Ms. Catir's memory was intact, she made good eye contact and her affect was appropriate; however, he gave her a GAF of 30 – a very low score. Moreover, the mental evaluation was only conducted one month after Ms. Catir's discharge from her second hospitalization. (Id.). In addition, Dr. Gallagher's opinion conflicted with the opinions of consultants, Drs. Taller and Miller. (R. 23-24).

At the fourth step, the ALJ must consider whether the claimant retains the RFC necessary to perform past relevant work.[2] 20 C.F.R. §§ 404.1520(e), 416.920(e). Ms. Catir's previous jobs did not meet the earnings requirements for substantial work activity. (R. 24). As such, the ALJ determined that Ms. Catir's past work experience did not constitute past relevant work as defined in the regulations. (Id.).

If the claimant is unable to resume her past relevant work, the ALJ proceeds to the fifth and final step. This step requires consideration of whether, in light of vocational factors such as age, education, work experience, and RFC, the

---

[2] The regulations state that "impairment(s) and any related symptoms, such as pain, may cause physical and mental limitations that affect what [one] can do in a work setting . . . residual functional capacity is the most [one] can still do despite [those] limitations."  20 C.F.R. § 404.1545.

claimant is capable of other work in the national economy.  See
20 C.F.R. §§ 404.1520(g), 416.920(g).  At this step, the burden
of proof shifts to the agency to establish that plaintiff
retains the RFC to engage in an alternative job which exists in
the national economy.  Pass v. Chater, 65 F.3d 1200, 1203 (4th
Cir. 1995); McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir.
1983); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980).
The agency must prove both the claimant's capacity to perform
the job and that the job is available.  Grant v. Schweiker, 699
F.2d 189, 191 (4th Cir. 1983).  Before the agency may conclude
that the claimant can perform alternative skilled or semi-
skilled work, it must show that the claimant possesses skills
that are transferable to those alternative positions or that no
such transferable skills are necessary.  McLain, 715 F.2d at
869.

Here, the ALJ's hypothetical described a person who is
functionally illiterate, able to perform light work and is
capable of understanding, remembering and carrying out simple
instructions.  (R. 343-344).  The ALJ further limited the job
requirements to where reading and handling money would not be
essential aspects of the job; reaching, handling and fingering
would be frequent but not constant or repetitive aspects of the
job; and there would be limited interaction with the public or
co-workers due to mood swings.  (R. 344).  Based upon the

hypothetical, the vocational expert testified that there were jobs available (e.g., cleaner, laundry sorter and cafeteria worker) in significant numbers in the national economy that Ms. Catir could perform.  (Id.).  Thus, the ALJ concluded that Ms. Catir was not disabled.  (R. 25-26).

## IV.  Standard of Review

The primary function of this Court in reviewing Social Security disability determinations is not to try the claimant's claims de novo, but rather to leave the findings of fact to the SSA and to determine upon the record as a whole whether the SSA's decision is supported by substantial evidence and whether the correct legal standard was applied.  42 U.S.C. §§ 405(g), 1383(c)(3); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence exists when the record contains "more than a mere scintilla of evidence but somewhat less than a preponderance."  Craig, 76 F.3d at 589 (citing Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  In other words, "[i]f there is evidence to justify a refusal to direct a verdict were the case

before a jury, then there is 'substantial evidence.'" Hunter,
993 F.2d at 34 (quoting Celebrezze, 368 F.2d at 642).

In its review for substantial evidence, this Court does
not determine the weight of the evidence or substitute its own
judgment for that of the Commissioner. Hays v. Sullivan, 907
F.2d 1453, 1456 (4th Cir. 1990). However, "[a] factual finding
by the ALJ is not binding if it was reached by means of an
improper standard or misapplication of the law." Coffman v.
Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Therefore, the
deferential standard of review applied to the Agency's findings
of fact does not apply to its conclusions of law or its
application of legal standards and procedural rules. Wiggins v.
Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982). After review,
this Court is empowered by 42 U.S.C. § 405(g) to affirm, modify,
or reverse the decision of the Commissioner with or without
remanding the case for rehearing. Melkonyan v. Sullivan, 501
U.S. 89, 98 (1991).

## V. Discussion

Ms. Catir argues that the ALJ made four critical errors in
his decision. First, Ms. Catir argues that the ALJ was
precluded from denying her claim because a report from Dr. Rose
was missing from the record, prejudicing her appeal. (ECF No.
14-1, 6-7). Secondly, she contends that her non-compliance with
medical advice cannot be a reason to deny benefits unless the

ALJ first made a finding of disability. (ECF No. 14-1, 7).
Furthermore, she asserts that she was incapable of being
compliant with her medical advice. (Id.). Thirdly, she
contends that the ALJ based his decision on "non-existent"
medical opinions. (ECF No. 14-1, 7-8). Finally, she claims
that the ALJ's hypothetical inadequately described her condition
to the vocational expert. (ECF No. 14-1, 8-9). Because these
assertions lack merit, the Court denies Ms. Catir's motion for
summary judgment.

**A. Dr. Rose's Evaluation**

At the reconsideration level, the Disability Determination
Services ("DDS") affirmed the initial decision to deny benefits
to Ms. Catir. (R. 32). The record reflects that Dr. Deborah A.
Rose participated in the decision. (Id.). Ms. Catir argues
that because there is no record of Dr. Rose's report, the ALJ
should be precluded from making a decision until Dr. Rose's
report is disclosed and thus all the medical evidence is
available. (ECF No. 14-1, 6-7).

The Commissioner responds that there is no evidence that
such a report was ever generated. (ECF No. 26-1, 16-17).
Furthermore, Dr. Rose's report cannot be of any benefit to Ms.
Catir's case, as the DDS affirmed the initial decision to deny
benefits even after Dr. Rose's review. (Id. at 17). Finally,
the ALJ did not rely on Dr. Rose's opinion in coming to his

decision.  (Id.).  As such, the Commissioner argues that there
is no evidence that Ms. Catir has been prejudiced by the absence
of Dr. Rose's report.  (Id.).

The Court agrees with the Commissioner.  First, there is no
indication that a "report" ever existed.  Second, Dr. Rose's
opinion obviously was unfavorable to claimant, as she found on
reconsideration that Ms. Catir was not disabled (as the initial
reviewer had done).  (R. 32).  Third, the ALJ did not rely on
Dr. Rose's opinion in coming to his decision.  Accordingly, the
Court rejects this argument as there is no evidence that Ms.
Catir has been prejudiced by the absence of Dr. Rose's "report."

**B. Ms. Catir's Non-compliance with Medical Directions**

First, Ms. Catir challenges only one of the several bases
of the ALJ's determination of her RFC, with respect to her
mental condition (R. 24).  The ALJ found, inter alia, that her
"record of non-compliance with treatment recommendations" was a
factor in her RFC determination or qualified light work.  (Id.).
First, it is clear that the ALJ articulated many bases for his
finding.

> As to the claimant's mental impairments, there was
> considerable difference of opinion between the
> treating internist and treating psychiatrist, on the
> one hand, and the consulting psychiatrist and
> psychologist, on the other.  The undersigned resolved
> this conflict in favor of the consulting psychiatrist
> and psychologist for the reasons stated above.  With
> respect to the claimant's mental condition, the above
> residual functional capacity is also supported by the

following factors: (1) that the claimant has not
been hospitalized since August 2005, (2) that she has
a record of non-compliance with treating
recommendations, including leaving the hospital
against medical advice and, more recently, skipping
therapy sessions, (3) that her medication appears to
be effective, and (4) that her pharmacy records show
no record of her being prescribed the medication
(Geodon) which caused the medication side effects she
alleges. In addition, the claimant's credibility was
questioned due to inconsistencies reflected in her
testimony, statements to examining sources, and
written evidence submitted for the record. Her
reports of her daily activities likewise seemed
inconsistent with the extent of disability alleged.

(Id.).

Second, while Ms. Catir argues that under Social Security
Ruling 82-59, there must first be a finding of disability before
a determination of non-compliance can result in a denial of
benefits (ECF No. 14-1, 7), this is clearly wrong.
Alternatively, she states that the record demonstrates that she
was incapable of complying with her medical directions. (Id.).
This also is wrong.

The Social Security Ruling 82-59 states:

An individual who would otherwise be found to be under
a disability, but who fails without justifiable cause
to follow treatment prescribed by a treating source
which the Social Security Administration (SSA)
determines can be expected to restore the individual's
ability to work, cannot by virtue of such "failure" be
found to be under a disability.

SSR 82-59. As this statement makes clear, a non-compliant
claimant cannot be found to be disabled. This does not mean,
however, that there must be a pre-requisite finding of

disability in order for the Agency to determine that a claimant is non-compliant, and consider that in the disability determination. On the contrary, the SSR merely prohibits a finding of disability when a claimant is non-compliant.

In addition to misinterpreting the SSR, Ms. Catir's argument is inconsistent with case law. The Fourth Circuit has ruled that if a symptom can be reasonably controlled by medication or treatment, it is not disabling. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Thus, a finding of disability is not a prerequisite for determining that a claimant is non-compliant. Id.; See also 20 C.F.R. § 404.1530. An ALJ may use non-compliance as a factor in evaluating a claimant's impairment. Accordingly, the ALJ properly considered Ms. Catir's non-compliance with medical directions when determining the severity of her mental conditions. (R. 22).

With regard to Ms. Catir's assertion that she was incapable of compliance, the Court notes that an ALJ's decision is binding on the Court to the extent that it is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). Contrary to Ms. Catir's contention, there is more than substantial evidence that she could comply with taking her medication even though she is bipolar. Ms. Catir herself testified that she was compliant with her medication and that she used a pill box to manage her

medication intake.  (R. 326-27).   Dr. Latif's notes indicate

that her medications were helpful and her conditions were

stable.  (R. 279-285).  Ms. Catir's history indicates that she

was more than capable of following instructions in taking her

medications and has actually taken her medications.   Therefore,

Ms. Catir's argument that she is incapable of being compliant is

without merit.

In any event, as discussed above, the ALJ's observation

regarding noncompliance was one of multiple bases for his

finding that her mental condition was compatible with qualified

light work.

## C. The ALJ's Greater Reliance on the Opinions of the Consultants, not the Treaters

Ms. Catir argues that the ALJ incorrectly relied on Drs.

Waseem, Yu, Taller and Miller (and not her treaters) because

these consultants never actually gave a medical opinion.  (ECF

No. 14-1, 7).  As such, she contends that the Court should not

interpret their silence as evidence of an opinion.  Ray v.

Astrue, 649 F. Supp. 2d 391, 405 (D. Md. 2009).

In Ray, the ALJ found that Dr. Diamond's medical opinion

that Ray "had limitations for sitting, lifting, carrying,

standing, walking and other postural activities" inconsistent

with Dr. Diamond's treatment notes which had not identified any

physical limitations.  Id.  The Ray court rejected the ALJ's

opinion because an ALJ should not "'interpret this silence
[about limitations in Ray's treatment notes] as affirmative
evidence' that the treating physician found no limitations on
Ray's RFC." Id. quoting Allen v. Bowen, 881 F.2d 37, 42 (3d Cir.
1989). "Instead, the 'proper inference from silence about [RFC]
in [a treating] physician's report is that the issue was not
considered."' quoting Mac v. Sullivan, 811 F.Supp. 194, 201
(E.D. Pa. 1993) (citing Allen).

Here, however, although Drs. Taller, Yu, Miller, and Waseem
did not complete an assessment form, while Drs. Gallagher and
Latif did, they each authored extensive medical reports and
therefore, there was no such "silence." (Dr. Taller) (R. 221-
227), (Dr. Yu) (252-255), (Dr. Miller) (261-267), (Dr. Waseem)
(268-271). Each personally examined and evaluated Ms. Catir. A
medical report need not be in the form of an RFC assessment
(SSA-4734-F4-SUP) in order to constitute a medical opinion. See
20 CFR § 416.927 ("Medical opinions are statements from
physicians and psychologists or other acceptable medical sources
that reflect judgments about the nature and severity of your
impairment(s), including your symptoms, diagnosis and prognosis,
what you can still do despite impairment(s), and your physical
or mental restrictions.").

Dr. Taller diagnosed Ms. Catir as having both mood and
personality disorders. (R. 233). Although he did not describe

the severity of these mental disorders, Dr. Taller did mention several factors in which the ALJ could infer the severity of these disorders. In his "Activities of Daily Living Report," he evaluated Ms. Catir as performing most of her activities on her own and on her own initiative. (R. 224). He opined that she was able to care for her personal needs, go grocery shopping and she shopped for clothes once every two to three months. (R. 225). He also opined that she was able to understand and follow simple instructions independently. (R. 226).

Dr. Yu's examination found numerous physical ailments including mild kyphosis of the thoracic spine (R. 252), a mild degree of tenderness on the thoracic spine and lumbar spine without obvious muscle spasm, a mild degree of tenderness in her wrists and small joints of both hands (R. 252-253), and a mild degree of diffuse tenderness on her bilateral ankles and knees. However, he reported that her shoulders, elbows, hands and ankles had a full active range of motion without pain and "without arthritic changes." (R. 252- 253). She was able to touch her ankles comfortably and her wrists and fingers were "very flexible." (R. 252). He evaluated her as having no knee effusion. (R. 253). Her hips were full in active range of motion without pain. (Id.). She had no limitations in sitting or standing and she had unlimited use of both upper extremities. (Id.). As such, Dr. Yu opined that "[c]linically [Ms. Catir]

has diffuse mild tenderness in the thoracolumbar spine and the wrists, ankles and knees bilaterally <u>without evidence of arthritis</u>." (<u>Id.</u>).

In Dr. Miller's diagnosis of Ms. Catir, he opined that she had reading, cognitive, bipolar, impulse control and personality disorders. (R. 263). However, he also opined that she could follow simple instructions. (R. 266).

At Dr. Waseem's physical evaluation, he noted that she climbed on the examination table without any problem and that she could bend over and bend to the side. (R. 270). He opined that both her carpal metacarpal phalangeal joints were normal and her joints examination was normal. (<u>Id.</u>). He also opined that her muscle power was 5/5 bilaterally and her deep tendon reflexes were 2+ on both knees. (<u>Id.</u>). Therefore, there was substantial evidence for the ALJ's findings based on these medical records of the consultants; the fact that the consultants did not use an assessment form does not deprive their medical opinions of force.

Ms. Catir further argues the ALJ discouraged the use of Dr. Miller's report in posing a hypothetical to the Vocational Expert. Rather, the transcript suggests that the ALJ was trying to prevent Ms. Catir's representative from misinterpreting Dr. Miller's report, in posing a hypothetical. (R. 346-351).

**D. ALJ's Hypothetical to the Vocational Expert**

At the fifth step, the Commissioner has the burden to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform.  McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983).  The ALJ may use a vocational expert's testimony to prove that there are jobs in the national economy that the claimant can perform.  Aistrop v. Barnhart, 36 Fed. Appx. 145, 147 (4th Cir. 2002).  The vocational expert's testimony must be based on a consideration of all the evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).  Ms. Catir argues that the ALJ's hypothetical was improper because it did not include all of her possible limitations, and therefore did not adequately describe her. (ECF No. 14-1, 8).

In Walker, the ALJ described the claimant as a person that could perform sedentary work, but did not list any of the claimant's impairments.  889 F.2d at 50.  The Court of Appeals for the Fourth Circuit said that the ALJ must accurately reflect the claimant's impairments based on all the evidence.  Id. at 50-51.  Indeed, the hypothetical need not include all limitations for which there is evidence.  Rather, the hypothetical must "fairly set out all of [the] claimant's impairments" (in the ALJ's view).  Id.  Here, of course, the ALJ

rejected much of the opinion of Drs. Gallagher and Latif on reasonable grounds and in his hypothetical set forth a description of the claimant based generally on the medical opinions and evidence that he credited. While the ALJ did not include every conclusion in the Mental Residual Functional Capacity Assessment of the DSS psychologist, it must be noted that there were only "moderate" limitations, and most of the conclusions were indeed included in his hypothetical (R. 344). Indeed, the limitations in sustained concentration and persistence, etc. were discussed with the VE and he testified that that level of impairment would not prevent competitive employment (R. 345-350). Here, the ALJ's description of Ms. Catir's mental capabilities, although not referring to every possible mental limitation, ensured that the vocational expert knew her capabilities and limitations. Walker, 889 F.2d at 51. Furthermore, the vocational expert attended the hearing and was given Ms. Catir's medical records. (R. 343, 346). See Walker, 889 F.2d at 51.

Ms. Catir declares that the ALJ must address every available medical opinion in the record in his hypothetical citing Smith v. Heckler, 782 F.2d 1176, 1182 (4th Cir. 1986). Smith does not so hold. Nor is this a correct statement of the law. An ALJ does not have to include every opinion in his hypothetical - just those he credits. Kearse v. Massanari, 73

Fed. Appx. 601, 604 (4th 2003); English v. Shalala, 10 F.3d
1080, 1085 (4th Cir. 1993); Yoho v. Comm'r of Social Sec., 168
F.3d 484, 484 (4th 1998).

Ms. Catir also argues that because SSR 96-8p contemplates
only full time work and Ms. Catir could only be 80-85%
productive, the vocational expert incorrectly found work
available. (ECF No. 14-1, 8). Quite the contrary, here, the
vocational expert evaluated Ms. Catir abilities to perform in an
ordinary work setting based on an 8 hour per day, 5 days per
week work schedule and found that she could be productive 80-85%
of the time. (R. 348-350). See SSR 96-8p. The fact that the
vocational expert found her to be only 80-85% productive does
not mean that she was not capable of working at least 8 hours a
day, five days a week. Neither does SSR 96-8p require that a
claimant be 100% productive to qualify for work. As such, the
vocational expert's testimony is supported by substantial
evidence and the ALJ's determination is upheld.

## VI. Conclusion

Having found Ms. Catir's arguments unsubstantiated by law
and the ALJ's analysis supported by substantial evidence, the
Court hereby DENIES claimant's motion for summary judgment and
GRANTS the Commissioner's motion for summary judgment.

Date: 4/27/11_____          _____/s/_____
                              Susan K. Gauvey
                              United States Magistrate Judge